In the Matter of the Application of WILLIAM H. SMITH and Eleven Others, Petitioners, Appellants, BERTHA MARDER, Intervenor, Petitioner, Appellant, for an Order against WILLIAM FELLOWES MORGAN, JR., as Commissioner of Markets of the City of New York, Respondent.

First Department, January 28, 1938.

*Abraham Buchman*, for the petitioners, appellants.

*Samuel Natapoff*, for the intervenor, appellant.

*Paxton Blair* of counsel [*Francis J. Bloustein* with him on the brief; *William C. Chanier, Corporation Counsel*, attorney], for the respondent.

DORE, J. By orders heretofore issued, the commissioner of markets revoked all permits in the Ninth Avenue Market. The commissioner's ground for the issuance of these orders was the opening on December 22, 1937, of the new Lincoln Tunnel to New Jersey.

The market in question, officially known as " Ninth Avenue Market," and sometimes popularly referred to as " Paddy's Market," is an open air market in the borough of Manhattan, on Ninth avenue, from Thirty-seventh street to Forty-second street, extending a distance of fifty feet east and west from Ninth avenue on Thirty-eighth, Thirty-ninth, Fortieth and Forty-first streets. The petitioners, except the intervenor, are retail dealers, pushcart peddlers, who, it is alleged, have been occupying stands in the market for periods varying from two to forty-eight years. They hold permits issued yearly by defendant, for which they pay a weekly license fee. The intervenor is an owner of real property located in the market area.

Petitioners contend that the commissioner had no power to abolish the market and his action in so doing was arbitrary, unreasonable and illegal; that the market does not in the least interfere with the flow of traffic to and from the Lincoln Tunnel and that the expected traffic congestion alleged as the ground of revocation was an excuse to accomplish the commissioner's publicly expressed policy of abolishing all open air public markets in the city of New York. Respondent contends that the commissioner had power to act as he did, that the facts negative any charge of arbitrariness; and that the permits being revocable conferred no vested rights entitled to protection by the court.

On October 15, 1937, the commissioner served notice on all licensees to vacate by December 22, 1937, and gave a subsequent notice advancing the date of eviction to December 1, 1937. The Special Term denied petitioners' motion by an order dated December 10, 1937, from which order this appeal is taken. Pending the determination of the appeal, a stay has been granted by this court and is still in force.

The issue of law presented is whether under the statutes applicable the commissioner has power completely to abolish a statutory public market.

The ordinance relied on by the petitioners, section 20, article 2, chapter 15, New York Code of Ordinances, was enacted by the board of aldermen, November 21, 1921, and established forty-eight open-air markets in the city of New York, including the market in question. So far as relevant, section 20 reads as follows:

" Street markets. The following designated territories and streets, or sections thereof, extending only from house line to house line on each block and for a distance not more than 10 feet from the curb lines to the centre of the roadways, unless otherwise specified, are hereby set aside and apart for public market purposes for the sale of fruits, vegetables, produce or other commodity, as designated in the permits issued therefor by the Commissioner: * * *

" 9th Avenue Market — On 9th Avenue, beginning at 37th Street and extending to 42d Street; and extending a distance 50 feet east and west from 9th Avenue on 38th, 39th, 40th and 41st Streets."

Within the jurisdictional limits of the city of New York, the ordinance in question has the same force and effect as a statute of the State Legislature. (*People ex rel. Doyle* v. *Atwell,* 232 N. Y. 96, 100; Ash, Greater New York Charter [5th ed.], § 44, and cases cited in annotation.) The authority of the board of aldermen to enact section 20, article 2, chapter 15 of the Code of Ordinances is not questioned. That power was vested in the board by section 47 and section 49, subdivision 9, of the Greater New York Charter and section 267 of the Agriculture and Markets Law.

The learned Special Term in an opinion held that it was the purpose of section 20 merely to designate the locations within which the commissioner of markets might lawfully issue market permits and that, in the proper exercise of his discretion for reasons of public health or safety, the commissioner had the power, which he claims, to revoke all permits and abolish the market. In support of this conclusion the court construed the phrase " as designated in the permits issued therefor by the commissioner " as qualifying

the words " territories and streets " and said: " Section 20, as the court reads it, provides that there are set aside for public market purposes *such of* ' The following designated territories and streets, or sections thereof * * * as ' *may be* ' designated in the permits issued therefor by the Commissioner.' " (Italics mine.) The italicized words " such of " and " may be " do not appear in the ordinance and their interpolation completely changes its obvious sense. The phrase " as designated in the permits " is placed in the ordinance immediately next to, and clearly qualifying and modifying the words " fruits, vegetables, produce or other commodity " that may be sold, and it is as far removed from the words " territories and streets " as it possibly could be. Such qualifying phrase does not and, in view of the obvious purpose of the enactment, could not refer to the words " territories and streets." The commissioner's power to designate has reference to the nature of the commodities to be sold, not the streets and territories where they may be sold. This is the necessary construction of the ordinance, whether it be analyzed from the point of view of language, logic or law. Its express purpose is the designation by the duly authorized legislative body of territories and streets that are to be used as public markets. The main clause of the sentence in question is " The following designated territories and streets * * * are hereby set aside and apart for public market purposes;" and there follows a long enumeration of streets and territories so " designated " and " set aside and apart," including the Ninth Avenue Market. The court has lifted the phrase " as designated * * * by the commissioner " from its proper place contiguous to and modifying the words " produce or other commodity " and placed it about six lines above, next to the words " streets, or sections," where it does not appear as the legislative body wrote the ordinance. The plain meaning of the ordinance is that the board of aldermen designates the territories; the commissioner, the products that may be sold in the territories that " are hereby," that is, by the ordinance, " set aside and apart " for public market purposes. In our opinion, the Special Term's construction of the ordinance is untenable and does violence to the plain and unambiguous language of the statute.

The commissioner relies on section 1, article 1, chapter 15 of the Code of Ordinances and section 261 of the Agriculture and Markets Law. Section 1, article 1, chapter 15 of the Code of Ordinances, headed " Control of Markets and Market Places; Weights and Measures," states that all public markets shall be " in the charge and under the control of the Department of Public Markets; Weights and Measures;" that the commissioner of public markets shall have immediate charge of all ground and buildings for market

purposes, of all vehicles, including the pushcarts, from which market produce is sold, all auctions and auctioneers doing business in the market place, and shall have all of the powers and duties of a city sealer of weights and measures under section 183 of the Agriculture and Markets Law. It further provides that rules for the care and use of markets, fees, stands and places therein, permits and leases shall be made by the commissioner. Section 261 of the Agriculture and Markets Law (formerly Farms and Markets Law), so far as relevant, provides that the commissioner of public markets in any city shall have " power, charge and control " of the construction, repair, maintenance and management of all public markets of such city and the buildings, structures and facilities thereon; of fixing fees for licenses; of making rules for the government of markets " not in conflict with the rules of the Department of Agriculture and Markets and subject to the approval of the board of estimate of the city or, if there be no such board, of the common council, board of aldermen or other corresponding legislative body;" of granting or revoking licenses to auctioneers in such markets; and of granting or revoking permits to buy and sell in such markets or upon such market places or land.

A reading of the section of the ordinance referred to in its context and section 261 and other relevant sections of the Agriculture and Markets Law indicates the intention of the Legislature to invest the commissioner of markets of a city with the regulation of public markets but not with the power either to establish or abolish them at will. Section 269 of the statute gives the commissioner the right to make rules for the " control, discipline and conduct of," the repair, care and use of markets, fees, hours of conducting business " and the general management of the markets," vehicles from which market products are sold, auctions and auctioneers, the establishment of standards for different classes of market produce not inconsistent with law, and the receipt, handling, storage and sale at public auction of market produce. Under section 270, such rules " shall be in force and effect upon the approval thereof by the Board of Estimate and Apportionment " of the city or, if there be no such board, the board of aldermen or other corresponding legislative body.

Pursuant to the authority given, the predecessor of the present commissioner prepared rules and regulations which were amended and approved by the board of estimate and apportionment on April 12, 1928, and on June 6, 1930, and duly promulgated. An examination of these rules confirms the conclusion here reached that the authority of the commissioner is merely regulatory. Rule

1 prescribes the qualifications of persons desiring to do business in open air markets, as follows:

A. Applicant must be a citizen or one who has applied for his or her first papers.

B. Applicant must not be the owner or operator of either a wholesale or retail business.

C. Applicant, when selling food-stuffs, must have a food handler's certificate from the department of health.

Rule 8, in consonance with the construction we have given to section 20 of the Code of Ordinances, prescribes that the commissioner " shall specify the commodity or commodities to be sold " and that any change of commodity shall be made only with his written approval. Other rules relate to matters of cleanliness, compliance with city ordinances, not leaving carts unattended, hours for opening and closing. Rule 3 provides that the commissioner may " revoke any permit at any time for a violation of the rules and regulations of the Department of Public Markets." It is to be noted that the commissioner's answer herein concedes that " none of the petitioners at the present time are charged with any infraction of the rules or regulations."

The ordinance and the applicable portions of the statute on which defendant relies, together with the rules and regulations enacted, indicate clearly that the commissioner's powers are purely executive, administrative and regulatory. They do not confer on the executive officer, either expressly or by implication, power to establish or abolish public markets that have been designated by statutory enactment of the properly authorized legislative body.

Under the new charter which came into effect January 1, 1938 (Chap. 36, § 833), it is to be noted that the commissioner of markets is invested with " the powers of a Commissioner of Public Markets under the Agriculture and Markets Law," which, as we have pointed out above, are strictly limited to regulation and give no power either to establish or abolish public markets that have been dedicated by the proper statutory authority.

The primary issue involved in this appeal is not the question of an abuse of discretion in the exercise of power given, it is possession of the power itself. The claim here is that the commissioner has power completely to abolish and end market areas and sections set up by the ordinance. We hold that the commissioner has no such power; that he may rule and regulate with the approval of the board of estimate and apportionment those market lands which have been designated by the board of aldermen as public markets, but he cannot, by his own act, unsanctioned and unapproved,

completely abolish such public markets. His order in question here is an edict of complete prohibition, not of regulation.

We are told that similar action by the commissioner has hitherto been approved by the courts, and the commissioner cites and relies on *Matter of DeLucca* v. *Morgan* (249 App. Div. 812 [1st Dept. 1937]); *Matter of Goodman* v. *Morgan* (251 id. 861 [2d Dept. 1937]); *Matter of Ortiz* v. *Morgan* (161 Misc. 471). The *DeLucca* case, affirmed in this court without opinion, is clearly not a precedent relevant here. There no claim was made of power to abolish a market; the license was revoked after a hearing for violation of rules, and there was evidence to sustain the commissioner's finding. In the case at bar we are considering complete abolition of a market and none of the petitioners is accused of a violation of any rule or regulation. In the *Goodman* case the market had dwindled from one hundred and twenty-five push-carts to eleven, and the commissioner had offered the petitioner a license in another market two blocks away. In so far, however, as that or other case cited approved authority in the respondent completely to abolish a public market established by ordinance, we are unable, for the reasons stated in this opinion, to reach such conclusion.

We find, however, controlling authorities indicating the contrary conclusion. *Matter of Picone* v. *Commissioner of Licenses* (241 N. Y. 157) was an application for a mandamus order to compel the commissioner to issue a license to the petitioner to operate a junk boat. The refusal was based on the grounds that the petitioner had no license to operate a junk shop and that there was no room for further applicants for junk boat licenses. The Court of Appeals, reversing a denial of the motion for a mandamus order, said: " If the commissioner could limit the number of junk boat licenses to one hundred we see no reason why he might not adopt the policy suggested by him that no licenses whatever should be granted and defend his action by asserting that he is convinced that the licensed junk boatman as such is an enemy to society and a menace to property in the harbor. The same reasoning might extend to junk shops generally and we would then have prohibition rather than the strict regulation of the business which has been imposed by ordinance. Laws are made by the law-making power and not by administrative officers acting solely on their own ideas of sound public policy, however excellent such ideas may be." Citing the *Picone* case with approval, the Court of Appeals in *Matter of Sausser* v. *Department of Health* (242 N. Y. 66), reversing a determination denying an order of mandamus, held that the

respondent could not arbitrarily reject the petitioner's application as he was concededly qualified to receive the license demanded. In *Matter of Goelet* v. *Moss* (248 App. Div. 499, at pp. 500, 501; affd., 273 N. Y. 503) this court said:

"We hold that the Zoning Law is the controlling authority as to what uses the owners may make of their property in a given district. That law takes into consideration the property values in the district and the uses to which the property may be put. Whether the erection of a theatre in a space which has been left free by the law for such purposes would depreciate property values is not a matter of concern of the commissioner of licenses of the city of New York. * * *

"We think the charter and ordinances show no intention of mixing police duties and zoning duties when the commissioner passes on applications for this sort of license."

In *Matter of Larkin Co.* v. *Schwab* (242 N. Y. 330) the Court of Appeals reversed a determination granting a mandamus order but, with regard to the limit of discretion allowed to a licensing authority, said: "In considering the power to issue a mandamus order for license, permit or consent, the courts must take into consideration the limits of the discretion which under the statute or ordinance is vested in the administrative body. Refusal to grant a permit must be considered arbitrary where based solely upon grounds which under the statute the administrative body may not consider. Under some statutes license to conduct a lawful business must be granted to any applicant of good character who complies with definitely formulated conditions. Refusal to grant a permit to a qualified applicant who complies with these conditions but fails to comply with other conditions which the administrative body seeks to impose, is arbitrary as matter of law. (*Matter of Picone* v. *Comr. of Licenses*, 241 N. Y. 157.) The additional condition might prove of public benefit, but the licensing authority had no power to impose it."

In the case at bar the commissioner has not refused to issue a license but has attempted eviction of all licensees, as the commissioner believes that the market may interfere with the flow of traffic to and from the Lincoln Tunnel. If the commissioner may revoke all permits in the Ninth Avenue Market, though none of the permittees has violated any rule or regulation, we see no reason why he may not adopt the public policy suggested by him in his 1936 report to the mayor, that is, "the abolition of the push carts from the streets," and, asserting that he is convinced that the operation of such public push cart markets is "an affliction to the city of New York" and an "evil," revoke all permits in all city

markets and thus completely abolish open air markets in the city of New York.  The answer to this claim of power is the answer of the Court of Appeals in the *Picone* case: " Laws are made by the law-making power and not by administrative officers acting solely on their own ideas of sound public policy, however excellent such ideas may be."

It is said that the licenses expired in any event on December 31, 1937.  If our conclusion is correct, this is no reason for denying the petition.  If the commissioner is without power to revoke a license on the ground that he had completely abolished the market, he is equally without power to refuse to renew a license on that ground alone.

As to the merits of the reasons alleged for the edict of revocation, we think there is much to be said in favor of the petitioners' contention that, even if the commissioner had power to revoke, his exercise of that power under all the facts and circumstances disclosed in the present case was arbitrary and unreasonable.  The affidavits submitted deal almost exclusively with an anticipated traffic problem that may arise after the opening of the Lincoln Tunnel.  It is the petitioners' and intervenor's contention that the prospective opening of the tunnel was used as a cloak in an attempt to carry out the commissioner's ideas of public policy with regard to push cart markets and end such markets in the city.  Undoubtedly the record shows that the commissioner's attitude and course of conduct indicate a fixed opinion that the open air public markets are an evil that should be eradicated.  In his 1936 annual report he takes pride in having, in the course of three and one-quarter years, reduced the number of permits from 4,800 to 3,676, declaring " since last Fall no more new push cart permits of any description have been issued."  Yet he concedes that, while " the arguments against the open air push cart markets are innumerable, it must in fairness be admitted that the peddler does render two very distinct services; he sells food at a price within the means of the poor, and he helps absorb the surplus which frequently gluts our wholesale food markets.  When the better produce has been picked up by the higher-type buyer, the peddlers descend on the markets and shop for left-overs and bargains."  He concludes his report with the statement: " There are two avenues open to us: one is the stringent enforcement of the regulations governing open air markets, the other is the abolition of the push carts from the streets and their enclosure in market buildings."

The circular of the Port Authority, with regard to the new Lincoln Tunnel, indicates that the tunnel does not come closer than 300 feet of Ninth avenue, that the approach to the tunnel

consists of a submerged plaza extending from Thirty-seventh street to the north side of Thirty-ninth street, that there is no approach to the tunnel through either Thirty-seventh, Thirty-eighth or Thirty-ninth streets, that each end of the plaza merges with Dyer avenue, the property of the Port Authority, which runs from Thirty-fourth street to Forty-second street parallel with Ninth avenue and about 300 feet west thereof. As Dyer avenue has six broad lanes, it is fair to assume that most motorists would continue in Dyer avenue up to Forty-second street, and that very few would turn into Fortieth street, the only east-bound street within the market area. If some vehicular traffic did continue through Fortieth street, the market would not necessarily interfere with its progress, for there, as elsewhere, traffic is regulated by traffic signals and is under the control of the police department. (Greater New York Charter, § 315; New Charter, § 435; Code of Ordinances, Traffic Code, chap. 24.) The whole question of possible traffic congestion is predicated on mere conjecture. An examination of the affidavits submitted fails to sustain the claim of expected hazard to public safety in the market streets or avenue alleged to have been created by the opening of the Lincoln Tunnel. If at any time the market should be shown to be a danger to public safety, the remedy to abolish it completely would lie with the legislative body that established it, or its duly constituted successor.

Accordingly, while we overrule the contention that petitioners have any " vested interest," we conclude that the respondent has not the power claimed.

The order of the Special Term should be reversed, with twenty dollars costs and disbursements, and an order issue directing and requiring the commissioner to revoke the orders of eviction dated October 15 and November 22, 1937, heretofore served on petitioners and other licensees of the Ninth Avenue Market.

MARTIN, P. J., O'MALLEY, GLENNON and UNTERMYER, JJ., concur.

Order unanimously reversed, with twenty dollars costs and disbursements to the appellants, and the commissioner ordered to revoke the orders of eviction dated October 15 and November 22, 1937, heretofore served on petitioners and other licensees of the Ninth Avenue Market. Settle order on notice.